UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| JOHN J. FORBIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:12-CV-85 (CEJ) |
| | ) | |
| CAROLYN W. COLVIN, Commissioner of Social Security, | ) ) | |
| | ) | |
| Defendant.[1] | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On January 7, 2009, plaintiff John Forbis filed an application for disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq.*, with an alleged onset date of December 22, 2008. (Tr. 89-90). After plaintiff's application was denied on initial consideration (Tr. 61-65), he requested a hearing from an Administrative Law Judge (ALJ). (Tr. 69-70).

Plaintiff and counsel appeared for a video conference hearing on June 2, 2011. (Tr. 32-51). The ALJ issued a decision denying plaintiff's application on June 10, 2011 (Tr. 10-27), and the Appeals Council denied plaintiff's request for review on October 9, 2012. (Tr. 1-4). Accordingly, the ALJ's decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, and should be substituted for Michael J. Astrue as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

## A.  Disability Application Documents

In his Disability Report (Tr. 114-23), plaintiff listed his disabling conditions as bipolar disorder, severe depression, attention deficit disorder (ADD), hypertension, ataxia, high cholesterol, shaking hands, and decreased memory.  In the past, plaintiff worked as a cook at a fast food restaurant, a health aide with two home health care services, a taxi driver, a laborer, a phone representative with a catalog order company, and a remodeling temp at a discount store.  Plaintiff reported taking Adderall for ADD, Lexapro for depression, and Lisinopril for high blood pressure.

In his Function Report (Tr. 151-61), plaintiff wrote that he lives in a house with his family.  On an average day, he wakes up, takes a shower, and then stays in his room until his mother requires help with household tasks.  He enjoys watching TV and being on the internet.  He talks on the telephone on a daily basis.  He also goes outside every day, and is able to go out alone and unsupervised.   He goes shopping for clothing and sporting goods, and although he needs help budgeting, he is able to pay bills and count change.  He stated that, with verbal encouragement, he does chores such as making his bed, cleaning his room, mowing the lawn, and taking care of his daughter and pets.  He said that he prepares meals, such as cereal, sandwiches, and TV dinners, on a weekly basis.  Plaintiff also stated that he visits family members on a weekly basis.

Plaintiff explained that, on some days, he does not want to do anything at all, and stays in bed in his pajamas.  He requires reminders to take his medication, and reported difficulty completing tasks, concentrating, understanding, following instructions, using his hands, and getting along with others.  He said that he handles changes in routine moderately well, but has a quick and explosive temper.

Several individuals submitted third-party function reports or questionnaires on plaintiff's behalf. Plaintiff's mother completed a third-party function report in July 2009. She stated that plaintiff lives at home with her and his father. She wrote that plaintiff spends his days talking on the phone, eating, watching TV, and going for walks, and that he helps to care for his daughter and the pet cat. She explained that plaintiff was diagnosed with ataxia when he was 8 years old, and is clumsy and unmotivated, with a short attention span and a low tolerance for stress. (Tr. 140 - 147).

In May 2010, plaintiff's sister and two family friends submitted questionnaires on plaintiff's behalf. Plaintiff's sister stated that plaintiff experiences pain in his hands, is easily distracted, cannot multitask, and cannot work without constant supervision. She also stated that plaintiff is unable to tell the truth. (Tr. 181-83). A family friend wrote that plaintiff struggles with motor skills, complains of pain in his hands, has difficulty following instructions, and is a "habitual liar." (Tr. 185-187). Another family friend said that plaintiff is immature and childlike, and has a short attention span. She remarked that plaintiff's ability to work is "questionable," and that plaintiff "doesn't know how to tell the truth" and "makes up stories or tells lies." (Tr. 189-191).

## B. Hearing on June 2, 2011

At the time of the hearing, plaintiff was 29 years old, 5'8" tall, and weighed 269 pounds. He lived in northern Missouri with his family. Plaintiff confirmed that he has a high school education, and that he had been a student in special education classes. After high school, plaintiff gained certifications in first-aid and CPR, and worked as a medical aide in a group home.

Plaintiff explained that he has ataxia, a form of cerebral palsy, which causes his hands to cramp if he writes or grips for more than 15 to 20 minutes. The cramps subside after approximately an hour of rest. The ataxia also causes him to stumble once or twice each day, and occasionally he falls down. He can walk 15 to 20 steps before he must use the walls to steady himself. He stated that he has no trouble sitting or standing, and can lift 15 to 20 pounds without pain.

Plaintiff testified that he suffers from bipolar disorder, depression, and affective mood disorder. He explained that one or two days per week are "bad days," during which he does not want to get out of bed. Approximately four days per week are "good days," during which he feels "uppity" and is able to play with his daughter. He explained that he has friends whom he interacts with online, not in person. Plaintiff stated that he also has ADHD, for which he used to take Adderall, and post-traumatic stress disorder (PTSD) arising from childhood molestation. His PTSD manifests in suicidal tendencies, and he recalled three suicide attempts, one of which resulted in his hospitalization after he tried to jump off a bridge in 2008. Plaintiff stated that he attends group therapy three days per week, meets with his social worker once per week, and sees his psychiatrist once every six weeks. He takes Lexapro for depression, Lithium for bipolar disorder, and Lisinopril for hypertension. (Tr. 32-46).

Amy Kutschbach, who holds a masters degree in rehabilitation counseling, testified as a vocational expert. The ALJ asked Ms. Kutschbach about the employment opportunities for a hypothetical individual with plaintiff's education and age, who is moderately limited in the ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods of time, perform at a consistent pace without rest, and respond appropriately to changes in the

-4-

work setting.  The ALJ added that this individual is able to use his hands only intermittently, must sometimes lean on a wall when walking, and can lift up to twenty pounds.  Ms. Kutschbach responded that there was no work such a person could perform.  The ALJ then altered the hypothetical and asked if jobs would be available for the same individual if he had less restricted use of his hands.  Ms. Kutschbach testified that such an individual could be employed as a laundry worker in a smaller hotel, as the individual would have time to rest his hands between loads of laundry.  She further stated that 200 to 250 of these positions exist in the region of rural northern Missouri, 17,000 of these positions in the state of Missouri, and 900,000 of these positions nationally.  (Tr. 47-51).

## C. Records

Plaintiff was diagnosed with ataxia at the age of eight.  In 1990, plaintiff was evaluated by a multi-disciplinary team that included a doctor, a psychologist, and a speech and language pathologist.  The team concluded that plaintiff had low-average intellectual ability, difficulty with manipulative and writing tasks, and significant deficits in visual-spatial-integrative and grapho-motor skills.  (Tr. 386-404).  High school records show that plaintiff continued to struggle with motor skills as an adolescent.  (Tr. 423).

As an adult, plaintiff has been diagnosed with ataxia, ADD/ADHD, bipolar disorder, and depression.  In 2006, plaintiff was approved for services at the Hannibal Regional Center due to his diagnosis of cerebral palsy with ataxia.  (Tr. 241-48).  On June 20, 2008, plaintiff visited his primary care physician, Larry Nichols, D.O., who observed that plaintiff was very depressed.  Dr. Nichols prescribed Lexapro, and a few weeks later plaintiff returned for a follow-up visit and reported feeling "a lot better."

(Tr. 326-27). Shortly thereafter, plaintiff stopped taking his medication. He was admitted to the hospital on September 29, 2008, after threatening to commit suicide. (Tr. 303-18). Plaintiff was diagnosed with acute depression, and was discharged from the hospital on October 3, 2008. He returned to Dr. Nichols on October 8, 2008, and reported feeling good again. Dr. Nichols prescribed Strattera for ADD and Lexapro for depression. (Tr. 328). On November 3, 2008, Dr. Nichols diagnosed plaintiff with hypertension, and started him on Lisinopril. Dr. Nichols noted that plaintiff was morbidly overweight and prediabetic. (Tr. 330-31).

On November 13, 2008, plaintiff presented for an initial psychosocial clinical assessment at Preferred Family Healthcare. He was diagnosed with major depressive disorder-severe without psychotic features, and chronic PTSD, with a GAF of 40. He was approved for medication management, weekly meetings with a social worker, and a psychosocial rehabilitation program. (Tr. 346-58). A few days later, on November 18, 2008, plaintiff presented for a psychiatric evaluation with Robert Parsonson, D.O. Dr. Parsonson observed that plaintiff was alert and oriented, and exhibited a cooperative attitude, an essentially appropriate affect with some flattening of expression, spontaneous motor activity, depressed mood, normal to slightly monotone speech, organized thoughts, no suicidal ideation, fairly good insight, impulse control, and judgment, and intact recent and remote memory. He diagnosed plaintiff with major depression, polysubstance abuse by history, and a remote history of ADD, with a GAF of 50. Dr. Parsonson recommended that plaintiff continue on his current medications, Strattera and Lexapro, and return for a follow-up appointment in one week. (Tr. 344-45).

On March 23, 2009, plaintiff visited Dr. Nichols for a routine follow-up. The doctor noted that plaintiff was morbidly obese, intellectually challenged, with hypertension, a history of major depression with suicidal ideation, ataxia, ADD, and slight hyperlipidemia. Dr. Nichols renewed plaintiff's prescriptions for Strattera, Lexapro, and Lisinopril. (Tr. 332). Plaintiff returned to Dr. Nichols on May 11, 2009. Plaintiff told Dr. Nichols that he was unable to keep a job because he was unable to stay focused. Dr. Nichols switched plaintiff's ADD medication from Strattera to Adderall. The doctor noted that plaintiff was going to Mark Twain Mental Health Center the next day for an evaluation. (Tr. 333).

On August 25, 2009, plaintiff was examined by Ted Oliver, M.S.W., L.C.S.W., at the Mark Twain Center for Behavioral Health. Mr. Oliver's report on plaintiff's condition was read and approved by Andrew Lovy, D.O. Plaintiff's thoughts were clear, his insight and judgment intact, his memory good, and his affect unremarkable. Overall, he was observed to be cooperative and pleasant. Mr. Oliver noted that plaintiff was trying to get back on Medicaid. Plaintiff was diagnosed with bipolar I and depression (by history), ADHD (by history), obesity, and ataxia, with a GAF of 50. Mr. Oliver remarked that plaintiff's ataxia made it difficult for plaintiff to maintain employment, and this difficulty was exacerbated by plaintiff's mood disorders when left untreated. (Tr. 337-38).

On November 17, 2009, Marc Maddox, Ph.D., completed a psychiatric review technique form. Dr. Maddox noted that plaintiff suffered from ADD/ADHD, bipolar disorder, and depression, but his restrictions on activities of daily living and difficulty maintaining social functioning were mild. He indicated that plaintiff has moderate difficulties maintaining concentration, persistence, and pace. Plaintiff told Dr. Maddox

that he had memory problems, difficulty tolerating stress and understanding and completing tasks, mood swings, difficulty standing, bending, and walking, and that he frequently falls. Dr. Maddox found these allegations to be mostly credible. (Tr. 365-76).

Dr. Maddox also completed a mental RFC assessment on November 17, 2009. He found that plaintiff had no marked limitations, but moderate limitations in the following: understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods; accepting instructions and responding appropriately to criticism from supervisors; responding appropriately to changes in the work setting; completing a normal workday and workweek without interruptions from psychologically based symptoms; and performing at a consistent pace without an unreasonable number and length of rest periods. (Tr. 377-80).

In October 2010, plaintiff was evaluated for ataxia by Matthew Harms, M.D., at Washington University Neuromuscular Clinic. Dr. Harms wrote that plaintiff's "difficulty with balance and fine motor coordination leveled off in his teenage years and has not worsened." He found that plaintiff exhibited mild leg spasticity and intact coordination. Plaintiff was able to walk on his heels and toes, and could turn around without bobbling. Dr. Harms concluded that plaintiff had ataxic cerebral palsy, and recommended that plaintiff see a neurologist, try Baclofen, a muscle relaxer, to improve his gait, and pursue gait rehabilitation physical therapy. (Tr. 460-62).

On October 16, 2009, plaintiff returned to Dr. Nichols. Plaintiff told Dr. Nichols that Adderall was helping his ADD, but he was still depressed. He also mentioned that he had been approved for Medicaid and wanted to see a psychiatrist. Dr. Nichols

continued plaintiff on his medication regime, and made arrangements for plaintiff to see a psychiatrist.  (Tr. 383).  On January 15, 2010, during a follow-up visit to Dr. Nichols, plaintiff reported worsening depression.  Dr. Nichols increased plaintiff's Lexapro dosage, and again referred plaintiff to a psychiatrist.  He also diagnosed plaintiff with type 2 diabetes. (Tr. 384).

On January 19, 2011, plaintiff presented for a psychosocial assessment with Lisa Ansell, Q.M.H.P., at Preferred Family Healthcare.  Plaintiff said that he was bipolar and depressed, and was just now seeking help because he was back on Medicaid.  He stated that, despite his ataxia, he could use a computer keyboard without problem because that did not require gripping a pen or pencil.  He also said that he is good at household management, and that he  loads the dishwasher, vacuums the house, cleans his room, and does laundry.  Ms. Ansell found plaintiff to be cooperative and oriented, with below average intellect, flat affect, and judgment in the normal range.  She observed that plaintiff walked without problem.  She prescribed Lithium and Lexapro, and assessed plaintiff's GAF at 50.  (Tr. 447-55).

On February 18, 2011, plaintiff appeared for a consultative examination with Frank Froman, Ed.D.  Dr. Froman observed that plaintiff had trouble writing during the evaluation, and would shake his hand out when it cramped.  Dr. Froman noted that plaintiff was friendly, animated, and fully oriented.  Plaintiff's cognitive ability, as measured by the Wechsler Adult Intelligence Scale-IV, was difficult to summarize, because plaintiff's verbal reasoning was much more developed than his non-verbal reasoning.  Dr. Froman concluded that plaintiff's moodiness might be attributed to bipolar disorder, but might also be due to the fact that plaintiff is bored and has nothing to do all day. He wrote that plaintiff has learned a "take care of me" mentality

and has become increasingly helpless. Dr. Froman diagnosed plaintiff with a documented history of bipolar I disorder, PTSD not currently expressed, and borderline intellectual functioning. He assessed plaintiff's GAF at 56. Finally, he observed that if plaintiff truly has periods where he cannot function because he is so severely depressed, then he would not be able to function in a work setting. Dr. Froman stated that the only evidence of these periods of extreme depression was plaintiff's word, but he felt that plaintiff was being honest. He also opined that plaintiff could manage the stress of customary employment if plaintiff was restarted in his previous career of caregiving. (Tr. 431-45).

### III. The ALJ's Decision

In the decision issued on June 10, 2011, the ALJ made the following findings:

1. Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2013.

2. Plaintiff has not engaged in substantial gainful activity since December 22, 2008, the alleged onset date.

3. Plaintiff has the following severe impairments: ataxia, bipolar disorder/depression, history of posttraumatic stress disorder (PTSD) and attention-deficit/hyperactivity disorder (ADHD), obesity, and borderline intellectual functioning.

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Plaintiff has the residual functional capacity (RFC) to perform light work with the following exceptions: he may have only minimal interaction with others, including supervisors and co-workers, he is limited to one- and two-step operations as well as limited stress tasks without highly competitive production quotas, he may only intermittently use his hands, and he may lift 15 to 20 pounds.

6. Plaintiff is unable to perform any past relevant work.

7. Plaintiff was born on December 16, 1981 and was 27 years old on the alleged disability onset date.

8.    Plaintiff has at least a high school education, and is able to communicate in English.

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the plaintiff is not disabled, whether or not the plaintiff has transferable job skills.

10.   Considering plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the plaintiff can perform.

11.   Plaintiff has not been under a disability, as defined in the Social Security Act, from December 22, 2008, through the date of the decision.

(Tr. 12-27).

## IV. Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner

-11-

has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite [his] limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects

of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. Discussion

Plaintiff argues that the ALJ erred in discrediting his subjective complaints, ignoring Dr. Frank Froman's opinion that he could not function in a competitive work setting, and relying on testimony from the vocational expert that was unreliable and in conflict with the Dictionary of Occupational Titles (DOT).

### A. The Credibility Determination

An ALJ may discount a claimant's subjective complaints "if there are inconsistencies in the evidence as a whole." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ must consider all evidence relating to those complaints, "including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: the claimant's daily activities; the duration, frequency and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness and side effects of medication; and functional restrictions." Id. The Court "will defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so." Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (internal citations and quotations omitted).

In this case, the ALJ concluded that plaintiff's statements regarding the intensity and limiting effects of his symptoms were not fully credible.[2] Plaintiff testified that, due to his ataxia, he could use his hands for only 20 minutes before he required at least an

_____

[2] The Court notes that this finding is consistent with the third-party questionnaires submitted by family and friends on behalf of plaintiff - all of which indicated that plaintiff cannot be trusted and frequently invents stories and tells lies.

-14-

hour-long break. However, as the ALJ observed, records show that plaintiff's ataxia and difficulty with motor skills has remained static and essentially unchanged since plaintiff's adolescence. Plaintiff's employment history demonstrates that he could hold a job despite his symptoms of ataxia. Furthermore, plaintiff was able to play computer games, chat online, and perform household chores on a daily basis. All of these activities require some use of his hands. The ALJ also discounted plaintiff's statements regarding his difficulty walking and frequent stumbling, as these statements were contradicted by the evidence as a whole. Dr. Harms found that plaintiff possessed intact coordination and the ability to walk on his heels and toes and turn around without bobbling. The ALJ noted that plaintiff did not follow Dr. Harms' recommendation for gait rehabilitation, calling into question the severity of plaintiff's condition. The ALJ also pointed to the observation of plaintiff's mental health treatment provider, Lisa Ansell, who observed that plaintiff had no trouble walking.

The ALJ also concluded that plaintiff's subjective complaints about his mental health problems conflicted with the majority of the evidence. The ALJ observed that plaintiff's mental health improved with medication. See Davidson v. Astrue, 578 F.3d 838, 846 (8th Cir. 2009) (conditions that can be controlled with treatment are not disabling). The only suicide attempt documented in the record occurred after plaintiff stopped taking his medications. The ALJ also noted that plaintiff's mental health care providers frequently found plaintiff's ADD and PTSD in remission and not currently expressed. The ALJ also considered plaintiff's sporadic treatment record, and remarked that plaintiff repeatedly did not follow referrals to mental health centers and psychiatrists. See Page v. Astrue, 484 F.3d 1040, 1044 (8th Cir. 2007) (suggesting that the ALJ properly considered plaintiff's failure to seek mental health treatment as

evidence supporting a determination that the plaintiff's mental health issues were not severe).  Finally, the ALJ gave significant weight to the opinion of Dr. Froman, who observed that plaintiff's mood swings could be greatly attributed to idleness and boredom.

Plaintiff challenges the ALJ's credibility determination on several grounds.  First, plaintiff takes issue with the boilerplate language used by the ALJ to summarize her credibility findings.[3]  However, when a credibility determination is otherwise explained and adequately supported by consideration of the relevant factors, the presence of this boilerplate language is unproblematic.  See Blackwell v. Colvin, No. 2:12-CV-58 (RWS), 2013 WL 5275954, at *11-12 (E.D. Mo. Sept. 18, 2013) (rejecting the same challenge to the same boilerplate language).

Plaintiff also contends that the ALJ erred in considering his sporadic treatment record and failure to comply with recommended treatment as evidence that his limitations were not as severe as he professed.  Plaintiff claims that his failure to pursue treatment is explained by his mental illness, borderline intellectual functioning, and difficulty obtaining Medicaid.  Mental illness may justify an individual's noncompliance with treatment recommendations, when the illness deprives that individual of "the rationality to decide whether to continue treatment or medication."  Pates-Fires v. Astrue, 564 F.3d 935, 945-46 (8th Cir. 2009).  However, the evidence in the instant case does not link plaintiff's mental limitations to his noncompliance.  Instead, the evidence shows that plaintiff had sound judgment, insight into his illnesses, and the

_____

[3] That language reads: "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 17).

-16-

rationality to make decisions about his treatment.  See <u>Wildman v. Astrue</u>, 596 F.3d 959, 966 (8th Cir. 2010) (concluding plaintiff's mental illness did not justify her failure to treat when "there is little or no evidence expressly linking [her] mental limitations to such repeated noncompliance"); <u>see also</u>, <u>Blackwell</u>, 2013 WL 5275954, at \*21 (same).

There is similarly no causal link between plaintiff's difficulty regaining Medicaid coverage and his failure to follow treatment recommendations and referrals.  Records show that plaintiff was, in fact, covered by Medicaid during the period of time throughout which he ignored his physicians' recommendations.  Plaintiff regained Medicaid coverage in 2009 (Tr. 383), and yet did not follow Dr. Nichols' repeated referrals to psychiatrists or any of Dr. Harms' recommendations to improve his gait. In 2011, plaintiff told medical providers that he had deferred seeking treatment because he had only recently regained Medicaid coverage (Tr. 488).  However, as noted by the ALJ, this statement is contradicted by the record which shows that plaintiff regained coverage in 2009.

Finally, plaintiff points to his GAF scores as evidence that the ALJ was mistaken in his credibility assessment and RFC determination.  Plaintiff was assigned a GAF score of 50 by several practitioners in 2008, 2009, and 2011.  His GAF has been assessed as low as 40 in November 2008, and as high as 56 by Dr. Froman during his consultative examination in 2011.  According to the DSM-IV, a GAF score of 41 to 50 indicates "serious symptoms... or any serious impairment in social, occupational, or school functioning...."  A GAF of 51 to 60 indicates moderate symptoms.  It is evident from the ALJ's decision that these GAF scores were considered, but the ALJ determined plaintiff's credibility, and ultimately the RFC, based upon the evidence on the record as a whole.

This was not error.  A GAF score is just one piece of evidence on the degree of an individual's mental impairment.  See 65 Fed. Reg. 50746, 50765-65 (Aug. 21, 2000) ("[The GAF scale] does not have a direct correlation to the severity requirements in our mental disorder listings.").  Furthermore, the Court notes that the ALJ gave Dr. Froman's opinion significant weight, and Dr. Froman assessed plaintiff's GAF at 56, a score indicative of only moderate limitation.

The ALJ considered the appropriate factors before discounting plaintiff's subjective complaints, and reached a credibility determination that is supported by substantial evidence.

## B.    The Opinion of Dr. Froman

The ALJ gave significant weight to the opinion of Dr. Froman, who conducted a consultative examination in 2011.  Plaintiff argues that, although the ALJ heavily relied on this opinion, she ignored the following sentence:

> If what John [Forbis] says is correct - namely that he has periods of three or four days, twice a month, when he cannot function because he is so severely depressed, he then would not be able to function in a competitive work setting, since no one would cope with this.  As this time I have only his word about this, although I felt he was being honest in his presentation.

(Tr. 438).  Plaintiff contends that by declining to adopt this portion of Dr. Froman's opinion, the ALJ engaged in the impermissible practice of drawing her own medical conclusions.  However, because Dr. Froman based this particular statement solely on plaintiff's word, and the ALJ determined that plaintiff's word was unreliable, it was proper to discount this portion of Dr. Froman's opinion.  See McCoy v. Astrue, 648 F.3d 605, 617 (8th Cir. 2011) (finding that substantial evidence supported the ALJ's decision to discredit the portion of a physician's opinion that was based on plaintiff's discredited self-reported symptoms); Teague v. Astrue, 638 F.3d 611, 615-16 (8th Cir. 2011)

-18-

(finding no error in ALJ's decision to discount doctor's opinion based only upon plaintiff's discredited subjective complaints).

### C. The Vocational Expert's Testimony

Plaintiff argues that the ALJ erred in relying on the testimony of the vocational expert, because it conflicted with the Dictionary of Occupational Titles (DOT) and was unreliable.

The portion of the testimony to which plaintiff objects includes the following exchange between the ALJ and the vocational expert:

> Q: And if [plaintiff] can use his hands I'm going to say - - I'm not sure - - not exactly normally because he has some limitation, a job without a lot of use of hands. How is - - is that possible past work or other work?
>
> A: No past work, Your Honor, but I would say there would be other work that could be performed such as a laundry worker who would use their hands in between loads of laundry so it wouldn't be - - it's defined as requiring frequent use of the hands by the Dictionary of Occupational Titles but there would be rest in between loads. The environment I'm thinking of as such in hotels or - - not large ones, but smaller hotels. That DOT code number is 302.685.010. That position is defined as light and unskilled according to the Dictionary of Occupational Titles. In the non-metropolitan areas of northern Missouri, there are approximately 200, to 250 of those type of positions. At the State level there's approximately 17,000, and at the national level there's nearly 900,000.
>
> Q: Now you're saying the person would use their hands for how long before they would have a rest?
>
> A: I'm trying to remember my observation of people employed in that position and the cycle of laundry was approximately 30 minutes. It took them about one-third to one-half of that time, so 10 to 15 minutes of use, with 10 to 15 minutes of rest before they would need to do it again....

(Tr. 49-50).

An ALJ must inquire about any apparent conflicts between the DOT and a vocational expert's testimony. See Social Security Ruling (SSR) 00-4p, 2000 WL 1898704, at *4. If there is indeed a conflict, the DOT controls unless the DOT

classifications are rebutted.  See Jones v. Astrue, 619 F.3d 963, 978 (8th Cir. 2010).

In the instant case, the vocational expert addressed the discrepancy between her

testimony and the DOT, without any prompting from the ALJ.  She explained that,

although the DOT defines the occupation of laundry worker as requiring frequent use

of hands, specific jobs exist within that occupation that require less frequent use of

hands.  She stated that employment at a small hotel in rural northern Missouri would

allow plaintiff to rest his hands for 10 to 15 minutes between each load of laundry.  She

clarified that her opinion was based upon her own observation of people employed in

such positions.

The vocational expert's testimony rebutted the DOT's generic description of the

occupation of laundry worker.  The DOT addresses only "occupations," broad categories

representing numerous jobs.  See SSR 00-4p, at *2.  "'DOT definitions are simply

generic job descriptions that offer the approximate maximum requirements for each

position, rather than the range.'  The DOT itself cautions that its descriptions may not

coincide in every respect with the content of jobs as performed in particular

establishments or at certain localities.  In other words, not all of the jobs in every

category have requirements identical to or as rigorous as those listed in the DOT."

Wheeler v. Apfel, 224 F.3d 891, 897 (8th Cir. 2000) (quoting Hall v. Chater, 109 F.3d

1255, 1259 (8th Cir. 1997)).  The vocational expert testified that, based upon her

observation of laundries in small hotels in rural areas, specific jobs exist within the

occupation of laundry worker which plaintiff could perform.[4]  See SSR 00-4P, at *3

(explaining that an apparent conflict between the DOT and expert testimony may be

reasonably explained by the fact that the DOT "lists maximum requirements of

_____

[4] The vocational expert also explained how the limitation to small hotel laundries would affect the number of jobs available to plaintiff.  See Tr. 50.

occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings"). Because the vocational expert provided a reasonable explanation for the apparent conflict, the ALJ was justified in relying on the expert's testimony. See Lamke v. Astrue, No. 10-3386-CV-S-ODS, 2011 WL 2360175, at *2-3 (W.D. Mo. June 9, 2011) (holding that any inconsistency between the DOT and expert testimony was explained by the expert's observation of specific jobs within a broader occupation); Welsh v. Colvin, No. C12-0102, 2013 WL 3338419, at *18 (N.D. Iowa July 2, 2013) (finding that the expert's own observations of people at work constituted a reasonable explanation for inconsistencies between her testimony and the DOT, when the expert concluded that plaintiff could perform some specific jobs within broad categories of occupations).

In conclusion, plaintiff has raised no persuasive argument that would discredit the vocational expert's testimony. The ALJ's reliance on that testimony was not error.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

IT IS HEREBY ORDERED that the relief sought by plaintiff in his brief in support of complaint [#12] is denied.

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 28th day of January, 2014.

-21-